**Gary Davis, Appellant,**

v.

**Gloria G. Means, Appellee.**

**Decided September 27, 1994**

## OPINION

Before Austin, Acting Chief Justice, and Ferguson and Morris, Associate Justices sitting by designation.

John A. Chapela, Esq., Window Rock, Navajo Nation (Arizona), for the Appellant; and George W. Robinson, Esq., Tuba City, Navajo Nation (Arizona), for the Appellee.

Opinion delivered by AUSTIN, Acting Chief Justice.

Two men claim to be the father of the same child in this paternity case. The dispute has been before the Oglala Sioux Tribal Court and Tribal Council in South Dakota, and has generated threats, animosity and confrontations among the parties. Gloria G. Means continues to insist that Gary Davis is not the father of her child in spite of the family court's ruling to the contrary. We conclude that 1) the prior ruling on paternity is res judicata, and 2) the child's best interests require that blood testing or chromosome testing or both be done to verify which of the two men is the father of the child.

## I

Gary Davis ("Davis"), the Appellant, and Gloria G. Means ("Means"), the Appellee, were married on June 6, 1976 in Chinle, Navajo Nation (Arizona). Davis is non-Indian and Means is a member of the Navajo Tribe. The parties separated in June 1984, and on November 28, 1984, Davis filed for divorce in the Window Rock District Court. The record shows that during the latter part of May or early June 1984, Means conceived a child. The child was born on February 19, 1985, three months after the divorce decree was granted.

During the divorce proceedings, the paternity of the child became an issue. Means testified that Davis was not the father of her child because she had maintained a sexual relationship with her current husband, Russell Means (a Lakota), during the time of conception. Davis testified that he also had engaged in active

sexual relations with Means during the same time. The testimonies of the parties conflicted and offered no assistance to the court.

Davis testified that he underwent a vasectomy in the fall of 1982, which was reversed on February 7, 1984. Davis had a semen analysis done on June 21, 1984, at the University of New Mexico School of Medicine. The physician performing the semen analysis did not appear in court, but stated in a letter that Davis' semen count was artificially low. The doctor opined that the low semen count could be attributed to recent sexual activity, or "the motility and the percent of normally shaped sperm could also be artificially low." Letter dated July 19, 1985. The physician concluded that the likelihood of Davis fathering a child was not impossible. The semen analysis was not conclusive as to Davis' ability to father a child. The physician's letter was unhelpful to the court in determining the child's paternity.

On November 11, 1984, Davis requested blood grouping tests to determine the child's paternity. Davis later withdrew the request, invoking the legal presumption that a child conceived during a marriage is the issue of that marriage. The trial court ruled on August 15, 1985 that Davis was not the father of the child, because he had "presented no expert evidence of his ability to have children during the critical [conception] time period."

Davis appealed that ruling on September 16, 1985. We held that the district court erred in placing the burden of persuasion on Davis and that Means should have carried the burden of overcoming the presumption of legitimacy, because she was the party challenging it. *Davis v. Davis*, 5 Nav. R. 169, 172 (1987). We then ruled as follows:

> [C]lear and convincing evidence proving one of the following will overcome the presumption of legitimacy: (1) That the husband is infertile or sterile and unable to father children; or (2) That the husband was entirely absent from his wife during the period conception must have occurred; or (3) That the husband was present but no sexual intercourse took place during the period of conception.

*Id.* at 172. We also stated that "[b]lood grouping tests have been used with great success in other courts for determining paternity." *Id.* We remanded the case for proceedings consistent with the guidelines established. *Id.* at 173.

On remand, the only issue was the child's paternity. The trial court record shows that neither party presented any significant evidence on remand. The record contains the same conflicting testimonies of the parties and the inconclusive physician's letter. Nothing substantial was added to the record. That may be because both parties changed attorneys so many times that the focus of the case disappeared in the shuffle. On June 6, 1990, the trial court ruled that Davis was the father because Means had not presented any evidence to rebut the legal presumption of legitimacy.

Means insisted that Davis was not the father and filed the second appeal on

July 5, 1990. We dismissed that appeal because counsel for Means failed to file a brief as required by our civil appellate procedure rules. *Davis v. Means*, 6 Nav. R. 278 (1990).

Davis sought visitation with the child, but Means denied him access. Davis filed a petition for joint custody in the Window Rock Family Court, which rendered its Final Decree of Joint Custody on May 3, 1991. The Decree granted Davis and Means joint legal custody of the child and ordered "gradual introduction of visitation" between Davis and the child. The Decree also orderd the Navajo Division of Social Services to perform a home study of "each party to determine how best to implement the exercise of visitation and joint custody ordered" by the court. Poor communication between Means and the social worker prevented the completion of a home study.

Means continued to deny Davis access to the child, restating her belief that Davis was not the father of her child. Consequently, the family court ordered Means to show cause why she should not be held in contempt for refusing to obey its orders. The court held a hearing where Means testified that the court could fine or imprison her, but she would not permit Davis to establish a father-son relationship with her son. On August 25, 1993, the court held Means in contempt and verbally admonished her for her conduct.

The basis for the present appeal is order B of the family court's August 25, 1993 Final Judgment, which is as follows:

> B. The implementation of the visitation schedule will be delayed until [the child] reaches over the age of twelve (12) years old. At that time, a psychological and emotional evaluation will be completed. With guidance from professional counselors, he can establish a father-son relationship if the child so chooses.

Davis claims that this order denies his fundamental right as a parent to visit with his son.

## II

The family is the core of Navajo society. Thus, family cohesion is a fundamental tenet of the Navajo People. It is Navajo customary law — *Dine Bi Beehaz'aanii* — or Navajo common law. *See Bennett v. Navajo Board of Election Supervisors*, 6 Nav. R. 319, 324 (1990) (discussing *Dine Bi Beehaz'aanii*). The Navajo Nation courts must apply that tenet to disputes involving children under the doctrine of *parens patriae*. *See, Barber v. Barber*, 5 Nav. R. 9 (1984) (a Navajo court must act as the parent of the child and do what is in the best interest of the child). The parties to this appeal agree that the child's best interests supersede their own wants.

Family cohesion under Navajo common law means there is a father, a mother and children. They comprise the complete initial family unit and are protected as such inside and outside the blessed home (*hooghan*) by the Holy People. The

eternal fire burning in the center of the hogan is testament that the family is central to Navajo culture and will remain so in perpetuity.

Navajo common law on the family extends beyond the nuclear family to the child's grandparents, uncles, aunts, cousins and the clan relationships. This is inherent in the Navajo doctrine of *ak'ei* (kinship). Two noted writers have said this of Navajo kinship:

> The importance of his relatives to the Navaho can scarcely be exaggerated. The worst that one may say of another person is, "He acts as if he didn't have any relatives." Conversely, the ideal of behavior often enunciated by headmen is, "Act as if nobody were related to you." Clyde Kluckhohn and Dorothea Leighton, *The Navaho*, 100 (Rev. ed. 1974).

When the family is complete, there is peace and harmony, which produces beautiful and intelligent children and happiness and prosperity throughout all the relationships. The family is blessed.

Paternity must be established for children, because children must know their father's clan to avoid incestuous relationships when they come of age. Navajo children are "born for" their father's clan. Children are owed obligations by their father's clan, and have obligations to it. Children are the fabric of a clan. Thus, the clan members want to know their children and have a right to know under Navajo common law.

In this case, the mother's insistence that Davis is not the father, in spite of the family court's ruling, causes dissension in the family unit. This is manifested by threats, animosity, confrontations, and disruptions in the lives of the parties and the child. Under Navajo common law, this family cannot achieve stability, and thus harmony, until the court determines with reasonable certainty which of the two men is the father of the child.

Under the Navajo doctrine of *ak'ei*, the grandparents, other extended family members, and the clan relations have a right to know the biological heritage of a child. The Navajo maxim is this: "It must be known precisely from where one has originated." This means all of the child's relations must know who the parents are, so the child will eventually know who is related and not related to him or her. The maxim focuses on the identity of a person (here the child) and his or her place in the world, and is a crucial component of the tenet of family cohesion.

Knowing one's point of origination (meaning the parents) is extremely important to the Navajo People, because only then will a person know which *adoone'e* (clan) and *dine'e* (people) the person is. Those precepts are essential to a Navajo's identity and must be known for Navajo religious ceremonies. One must know them to seek *hozho* (harmony and peace). When applied to a child, they are necessary for the child's emotional, physical, and spiritual well-being. Thus, under Navajo common law, the child's best interests require that the father be determined with reasonable certainty.

There are other important reasons for determining the child's father in this

case. Means and her husband enrolled the child in the Lakota (Sioux) Tribe. Obviously, if the child does not have Lakota blood then he cannot legally be enrolled in that tribe. The Navajo Tribe would be the only tribe to enroll the child. Enrollment is an eligibility requirement for various benefits such as educational assistance, land assignments, medical care and other benefits which are particular to an Indian tribe. Inheritance, child support, religious training, and the father's rights to make decisions regarding his child's education and future are also important reasons for determining the child's paternity.

The best interests of the child can be served only by the court determining with a reasonable certainty which of the two men is the father of the child. Our conclusion is supported by Navajo common law and the reasons identified above.

## III

The best procedure for resolving the issue of paternity in this case is through blood testing or chromosome (DNA) testing or both. These scientific methods provide the best practical solution given the lack of evidence presented at trial. We establish that a Navajo Nation court has power, either on its own motion or on motion of any party, to order scientific testing to aid it in making a decision on paternity. The Navajo Rules of Civil Procedure restates that power:

> When the mental or physical conditions (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control....

Nav. R. Civ. P. 35(a).

The sparse and conflicting evidence on paternity offered by the parties in this case gave little assistance to the trial court in arriving at its decision. Decisions affecting paternity are too important to Navajo society and common law to be based solely on insubstantial and speculative evidence.

This case is similar to a paternity case decided by an Arizona court. There the court said, "[t]he lack of evidence presented in this case is particularly disturbing considering the present availability of sophisticated blood testing and other procedures. Such testing can be an invaluable aid in excluding or identifying a child's natural parents." *Allen v. Sullivan*, 677 P.2d 305, 308 (1984) (Judge Meyerson concurring). Likewise, in *Chavez v. Thomas*, 5 Nav. R. 33 (1985), blood testing served an invaluable aid in solving a paternity dispute. We believe blood or chromosome testing can serve the same role in this case.

Some concerns were raised by counsel at oral argument that drawing of blood samples may be against the beliefs of Means or her husband, Russell. That argument was not developed, and it could be probative under different facts, but here the best interests of the child outweigh any concerns the Means may have about scientific testing. Moreover, the parties agree that the child's best interests take

precedence over their own desires.

The family court is in the best position, with the input of the parties, to set forth the details on which scientific testing should be used, who should be tested, who should bear the expenses, and how the results should be introduced, interpreted, and used. It would benefit all the parties concerned, including Mr. Means, to cooperate with the family court in arriving at a final solution to this case.

The trial court's decision that Davis is the father of the child is res judicata and binds all parties to that case. *Halwood v. Estate of Badonie*, 6 Nav. R. 16 (1988). The judgment declaring Davis to be the father may be reopened or overturned only upon a showing of new evidence or "other reason justifying relief from the enforcement of the judgment." Nav. R. Civ. P. 60(c). This Court finds that such "other reason," is the making of a more precise determination of paternity, in the best interests of the child, through scientific testing as described in this opinion.

We remand this case to the Window Rock Family Court for the entry of orders requiring the parties to submit to blood and/or chromosome testing. In the event that Means refuses to cooperate with the process, or urges others not to cooperate as may be necessary for a conclusion to this case, the family court shall use its powers to enforce the prior order establishing paternity and order immediate visitation. If the parties cooperate, and the family court finds Davis not to be the child's father, the prior judgment shall be reopened for a decision in accordance with the scientific finding.